IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 10, 2009 Session

# MICHAEL EUGENE SAMPLE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. P-14252, P-10627, P-06948 & P-07021    Chris Craft, Judge**

---

**No. W2008-02466-CCA-R3-PD - Filed June 15, 2010**

---

In 1981 a Shelby County jury convicted the Petitioner, Michael Eugene Sample, and his co-defendant, Larry McKay, of two counts of felony murder and imposed upon both men a sentence of death. On direct appeal, the Petitioner's convictions and sentence were affirmed. *State v. McKay and Sample*, 680 S.W.2d 447 (Tenn. 1984), *cert. denied*, 470 U.S. 1034 (1985). The Petitioner filed multiple post-conviction petitions, one of which was filed in 1995 and is the subject of this appeal. In that petition, the Petitioner contended that: (1) the State violated his right to due process and a fair trial by suppressing exculpatory evidence against him; (2) the State knowingly presented false testimony; and (3) his sentence of death violates *Apprendi* because the jury imposed the sentence based upon aggravating circumstances that were not contained in the indictment, presented to the grand jury, or proved to the jury beyond a reasonable doubt. The post-conviction court dismissed the petition, and, after a thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

David M. Eldridge and Loretta G. Cravens, Knoxville, Tennessee, Michael E. Scholl, Memphis, Tennessee, for the Appellant, Michael Eugene Sample.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Direct Appeal**

This case arises from the 1981 murders of Benjamin Cooke and Steve Jones, which occurred at the L&G Sundry Store in Memphis, Tennessee. The facts underlying the Petitioner's convictions were set forth in our Supreme Court's opinion affirming the Petitioner's convictions and sentence on direct appeal:

On August 29, 1981, at approximately 11:00 p.m. Melvin Wallace, Jr., went into the L&G Sundry Store at 1069 North Watkins in Memphis to purchase two barbecue sandwiches. When he entered, there were four men in the Sundry Store, including two clerks, Benjamin Cooke and Steve Jones, who were known to Wallace as he was a regular customer. The other two black men were the defendants, Larry McKay and Michael Eugene Sample. Wallace did not know them but positively identified them in a line-up at 2:43 p.m. on August 31, 1981, as the murderers of Cooke and Jones and Sample as the person who shot him in the thigh and back and attempted to shoot him in the head.

Wallace testified that he went to the back of the store where Cooke had gone to prepare the sandwiches. McKay was also standing in the back with a quart of 45 Beer mumbling to himself. Not wanting to get involved with a drunk, Wallace turned and directed his attention to the front of the store where Jones and defendant Sample were standing. When he thought the sandwiches would be ready, he looked around at Cooke and saw that McKay had gone behind the counter and was holding a gun at Cooke's head. When Wallace realized "it was a robbery" and "broke and ran for the front door," Sample hollered for him to halt and shot him in the thigh. Wallace tried to play dead but Sample came over and said, "This nigger ain't dead," and shot him in the back. Wallace had heard Sample demanding that Jones give him all the money and heard Jones say, "Man, I gave you everything I had." After hearing Sample say several times, "I ought to kill all you son-of-a-bitches," Wallace heard him say, "Kill every son-of-a-bitch in here," and the defendants started shooting. Wallace testified he saw McKay shoot Cooke in the head. Sample came back to where Wallace was lying on the floor and put a pistol to his head. It clicked several times and did not go off. Wallace testified that he "came up off the floor" and started wrestling with Sample. The gun went off past Wallace's head and he lapsed into unconsciousness. When Wallace woke up, he heard Sample say, "Let's get the hell out of here."

2

Cooke and Jones died from the bullet wounds to their heads; but when the police arrived shortly after the killers left, Wallace was able to give them information about the episode and gave a description of the killers while he was receiving medical care at the scene and at the hospital. One of the investigating officers remembered that a grocery store across the street from the L&G Sundry Store had been robbed about ten days earlier, and that the witnesses had said the robbers were two black males wearing blue-green surgical caps. Among the items taken in that robbery was a .45 caliber automatic pistol that had a tendency to misfire. Shell casings from a .45 caliber automatic were found in the Sundry Store; and putting together leads from the two robberies, the police apprehended Sample and McKay the next day. They were in a car with a third man, and the .45 automatic with the serial number of the pistol stolen from the grocery across the street was found on McKay. A .32 caliber revolver was found inside the car. Bullets recovered from Jones' cheek, Cooke's head and chest and Wallace's leg had been fired from the .32 caliber revolver found in the car. Two blue hospital surgical caps were found in the car. More than two hundred and perhaps as much as seven hundred dollars in cash was stolen from the Sundry Store; and McKay, who was unemployed, had $166.30 on his person when arrested. Sample had $195 in cash at that time. The third man in the vehicle testified to incriminating circumstances linking defendants to recent criminal activity.

Charles Rice, age sixteen, went to the L&G Sundry Store to buy cigarettes and as he arrived at the door he saw the robbery in progress, specifically the gun pointed at the head of one of the clerks. He turned and ran home and told his mother what he had seen and later reported the information to the police. He made a positive identification of both defendants.

*State v. McKay and Sample*, 680 S.W.2d 447, 448-49 (Tenn. 1984). Both Petitioners Sample and McKay were convicted of two counts of felony murder. At the sentencing hearing to determine punishment, Petitioner Sample introduced mitigating evidence that he was an "exceptionally good" and "very conscientious" employee. *Sample v. State*, 82 S.W.3d 267, 269 (Tenn. 2002). Several family members testified about Petitioner Sample's work history, character, and qualities as a husband, father, and son-in-law. Petitioner Sample's mother testified that he was a good son and asked the jury to spare his life. Petitioner Sample testified that he did not commit the murders and asked the jury to spare his life for the sake of his son and wife. The jury sentenced Petitioner Sample to death based on three aggravating circumstances: that he created a great risk of death to two or more persons other than the victims who were murdered; that he committed the murder to avoid, interfere with,

3

or prevent a lawful arrest or prosecution; and that the murders were committed in the course of committing a felony. *Id*. (citing T.C.A. § 39-2404(i)(3), (6), (7) (Supp. 1981)).

## B. Post-Conviction Proceedings
### 1. Procedural History

After the Petitioner's convictions and sentences were affirmed on direct appeal, he filed numerous petitions for post-conviction relief; all were denied. *See, e.g., McKay & Sample v. State*, No. 25, 1989 WL 17507 (Tenn. Crim. App., at Jackson, Mar. 1, 1989), *perm. app. denied* (Tenn. July 3, 1989); *Sample & McKay v. State*, No. 02C01-9104-CR-00062, 1995 WL 66563 (Tenn. Crim. App., at Jackson, Feb. 15, 1995), *perm. app. denied* (Tenn. Jan. 27, 1997); *State v. McKay & Sample*, No. 02C01-9506-CR-00175, 1996 WL 417664 (Tenn. Crim. App., at Jackson, July 26, 1996), *perm. app. denied* (Tenn. Dec. 2, 1996). In 1992, the Court of Appeals held that the Tennessee Public Records Act applied to criminal cases under collateral review, and, pursuant to that opinion, the Petitioner requested a copy of the State's file from his trial. *Capital Case Resource Center v. Woodall*, No. 01-A-019104CH00150, 1992 WL 12217 (Tenn. Ct. App., at Nashville, Jan. 29, 1992), *superseded by statute as stated in*, *Waller v. Bryan*, 16 S.W.3d 770 (Tenn. Ct. App. 1999). In September 1993, the Petitioner received a copy of the file, and, based on the documents contained therein, he filed another petition for post-conviction relief in 1995, which is the subject of this appeal.

In the 1995 petition, the Petitioner complained that the prosecution violated his rights to due process and a fair trial under the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution by suppressing exculpatory evidence. *Sample*, 82 S.W.3d at 269-70 (citing *Brady v. Maryland*, 373 U.S. 83 (1963); *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001)). Relevant to this appeal, the petition alleged the State failed to turn over the following evidence with regard to the following witnesses:

1. Melvin Wallace – evidence that Wallace could not identify Petitioner Sample from a line-up, as evidenced by two documents: a report of Officer J.D. Welch and a supplement to F.G. Warner. Also, Officer Welch's report which contradicted Melvin Wallace's trial testimony that Petitioner Sample had fired all three shots at him.

2. Charles Rice – a document titled "Supplementary Offense Report" dated September 1, 1981, in which Charles Rice, a State's witness, told police that one of the robbers had a noticeable scar.

3. Grover Jones – a document titled "Memphis Police Department

Supplementary Offense Report" dated August 30, 1981, in which Officer Malone relayed his suspicions that Grover Jones, one of the victim's uncle, was the owner of the L&G grocery store and may have been involved in drug dealing and may have been withholding information from police.

4. Sammy House – a document titled "Supplementary Offense Report" dated August 30, 1981, in which Officer Malone related a conversation with Eddie Wright, the owner and victim of the robbery at Lillie & Eddie's Grocery, during which Wright said a friend had identified Sammy House as a person involved in the robbery.

5. Willie Everett – a statement from Willie Everett provided on August 30, 1981, in which Everett provided a description of the robbers and vehicles present at the Lillie & Eddie robbery (which occurred before the L&G Sundry robbery/murders).

6. Annie Lowe – a twelve page copy of a supplement written to F.G.Warner related that another grocery store, Lowe's Cash Grocery, that belonged to Annie and Tommy Lowe, was robbed by two men on August 7, 1981, and August 29, 1981. Annie Lowe identified Petitioner McKay from a line-up as one of the robbers but did not positively identify anyone else.

The petition also alleged that the jury's reliance upon the felony murder aggravating circumstance violated article I, § 16 of the Tennessee Constitution. *Sample*, 82 S.W.3d at 269-70 (citing *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992)). The lower court dismissed the petition without a hearing as being barred by the statute of limitations. *Id*. A panel of this Court reversed the lower court's dismissal and remanded for a determination of whether the petition should be evaluated as a later arising claim. *Id.* On remand, the lower court again found that the petition had been filed outside the statute of limitations. *Id*. This Court affirmed the lower court's dismissal. *Id*. The Tennessee Supreme Court held that due process required that the Petitioner be able to present, outside the three-year statute of limitations, his claims that the State had withheld exculpatory evidence, and the Court reversed and remanded the case to the post-conviction court for further proceedings. *Id*. at 279.

The Petitioner filed amendments to his petition, raising the issue that his sentence had been unconstitutionally imposed based upon aggravating factors not charged in the indictment and not proven beyond a reasonable doubt in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

## 2. Proof at Post-Conviction Hearing

On remand, the post-conviction court noted that he had inherited the cases of Petitioners McKay and Sample from a then retired judge and ordered the proceedings for the two Petitioners be separated, and neither party objected. Evidence was then heard on both petitions, with Petitioner Sample first presenting the following evidence:

Mark Alan Saripkan testified that he sat as second chair, with Stanley Fink as lead counsel, representing Petitioner Sample. As second chair, Saripkan was responsible for keeping track of all paperwork, including pretrial discovery. He could not recall any information provided by the State denominated as exculpatory evidence. Saripkan did recall receiving a police summary offense report concerning victim Steven Jones, which contained a statement from Melvin Wallace, the victim who survived this robbery/murder. In Wallace's statement, he said he did "not notice a second subject."

Saripkan identified a letter from Officer F.G. Warner in the violent crimes bureau of the Memphis Police Department concerning the identifications of Larry McKay and Michael Sample. He did not recall having this document before the trial. This document reflected that police conducted a lineup on August 31, at 2:55 p.m., and that Petitioner Sample was present in the lineup. The document states that Wallace viewed the lineup but said he could not identify "anyone as being the one responsible because he had really only seen one of the male blacks and that was the one that bent over him and shot at his head with a .45 automatic." Saripkan said the document would have been useful preparing to cross-examine Wallace concerning Wallace's in-court identification of the Petitioner.

Saripkan identified a summary offense report dated August 30, 1981, concerning victim Steve Jones that Saripkan had not received before trial. The report indicated that police had previously found a considerable amount of marijuana at the L&G Sundry store. It further indicated that Grover Jones was unable to answer questions because he was crying and beating himself against a wall. The author of the report opined that Grover Jones was not telling police all the information he knew about the store, the drugs, and the money. Saripkan said he "believe[d]" he would have found this information helpful in his defense of Petitioner Sample in that it would have given him the opportunity to question other individuals concerning the drug activity at the store and provided an alternative theory about what happened.

Saripkan recalled the State's introduction at trial of the Petitioner's involvement in another robbery, which occurred shortly before this robbery/murder, at a nearby grocery store named Lillie & Eddie's Grocery Store. The State asserted that the robberies were both perpetrated by Petitioner Sample and Petitioner McKay and that the two men acted alone.

6

Saripkan then testified that the August 30, 1981, report that the State failed to disclose indicated that Wright, the owner of Lillie & Eddie's Grocery, told police that an anonymous source told him that "Sammy House," known in the area as a "holdup man," was responsible for the robbery at Lillie & Eddie's Grocery. Wright then gave a description of the vehicles involved in the Lillie & Eddie's Grocery robbery, which included a Buick Electra and a '63 Chevy. Wright additionally indicated that a man named "Marvin" may have been involved in the Lillie & Eddie's Grocery robbery. Wright also told police that on the day of the L&G robbery murders he saw a group, which included House, of older black men riding bikes near the L&G Sundry store.

Saripkan indicated that he would have found Wright's statements useful in his defense preparation because he, or his investigator, could have learned more about the individuals seen by Wright. Additionally, he could have used this information to cross-examine Wright.

Saripkan next identified a statement, which Saripkan did not receive before trial, that Willie Everett gave Sergeant Wheeler of the Memphis Police Department on August 30, 1982. Sergeant Wheeler showed Everett, a witness to the Lillie & Eddie's robbery, a photograph of Marvin Phillips, and Everett stated that Phillips's car was present at the Lillie & Eddie's robbery. Everett also told police that he saw a '65 Chevrolet and a '73 or '74 Buick arrive at the store during the Lillie & Eddie robbery. Everett told police the people in the two cars were armed with shotguns, got out of the cars, and had some contact with the men who had robbed the store. Everett said the men then got back into the cars. Saripkan said this information would have aided the defense preparation, because the State contended that only two individuals robbed Lillie & Eddie's Grocery, which was inconsistent with Everett's statement.

Saripkan next identified a "Supplement Offense Report" dated September 1, 1981, which he also did not receive before trial. This report contained a description of the two suspects provided by Charles Rice, a sixteen-year-old witness to the L&G Sundry store robbery/murders. The description included the fact that one of the suspects had a noticeable scar on the left side of his face or neck. Saripkan stated that the defense had never received this information regarding Charles Rice's initial description of the perpetrators. Mr. Saripkan stated that Petitioner Sample has no visible scar down the left side of his face or neck, and he could not recall Petitioner McKay having any such scar. He stated that this information, therefore, would have been important in the preparation for the defense of the Petitioner and in cross-examining Rice.

Saripkan identified a letter dated November 17, 1981, to F.G. Warner regarding an arrest report of two robberies at Lowe's Cash Grocery, one of which occurred on August 7, 1981, and the other on August 29, 1981. Witnesses at both the Lowe's robberies identified

7

Petitioner McKay as a participant but did not identify Petitioner Sample as a participant in either robbery.

Saripkan identified a statement Annie K. Lowe gave to police on August 31, 1981, describing the Lowe's Grocery robbery on August 29, 1981. Annie Lowe stated that she saw three black men running across the street after the robbery. Saripkan stated that the fact that Lowe saw three men would have been useful to his defense. He explained that Petitioner McKay had been identified in two robberies other than the L&G Sundry Store robbery and that Petitioner Sample had not been identified in these other two robberies. Saripkan felt Lowe's testimony would have refuted the State's evidence of these other robberies, which the State introduced to bolster their case against Petitioner Sample. Saripkan stated that the identification of Petitioner Sample as a participant in the L&G Sundry Store robbery was a critical issue at trial.

On cross-examination, Saripkan conceded that the events about which he was testifying occurred twenty-three or twenty-four years before the hearing and that he could not specifically recall what the file contained. He explained that "Mr. Fink had the file and I did not have access to it." Saripkan further conceded that he could not identify each individual the defense team interviewed in preparation for trial. He admitted that Willie Everett did not testify at the Petitioner's trial. Saripkan testified that the information Everett gave implicating House in the Lillie & Eddie's robbery was not reliable. He agreed the police ran a report on House and found he had no previous convictions. Saripkan said the portion of Everett's testimony that described different vehicles and suspects as being involved in the Lillie & Eddie's robbery would have aided the defense. Saripkan agreed that one of the cars Everett described was a blue Mercury and that Petitioner Sample was riding in a blue Mercury when police arrested him.

Saripkan conceded that, in addition to identifying Petitioner McKay in a lineup, Annie Lowe also said about Petitioner Sample (who was in position six in the lineup) "Number six, I'm not positive about him being the second guy involved, the one who snatched the money from our drawer in the register, but without a doubt [Petitioner McKay] was the one who held us up twice."

Saripkan conceded that no drugs were found at the L&G Sundry Store immediately following the robbery. Saripkan agreed that the suspects in the L&G Sundry Store would still be guilty of robbery even if the robbery had been perpetrated in part because of drugs.

Saripkan agreed that confusion arose about the type of gun Wallace saw suspects one and two carrying and, therefore, which one had shot Wallace. Saripkan agreed that Wallace caused part of this confusion when, while in the hospital, he said he could not identify the

robbers. When Wallace identified Petitioners Sample and McKay at trial, he explained that he was on heavy doses of medication in the hospital and, therefore, could not recall what he said while he was in the hospital.

Saripkan agreed that Rice was cross-examined extensively about his statement that one of the suspects had a scar. Saripkan conceded that the defense team had Rice's statement wherein he failed to mention the suspect's scar. On cross-examination, at trial, the defense highlighted that Rice had initially denied being at the store during the robbery, that Rice had lied to police and to a defense team investigator, and that Rice did not come forward until his mother pressured him to do so.

Stanley Fink testified by deposition that he once practiced law in Memphis, but had retired, and was eighty-three at the time of his deposition. During his career, he represented the Petitioner. Fink had difficulty recalling some details of his representation, explaining that he had suffered serious illness over the previous four or five years. Fink read the supplementary police report that indicated police had issued a search warrant for the L&G Sundry store a year before the robbery to investigate drugs. He said he did not recall having this information before Petitioner Sample's trial and said, if he had possessed this information, he would have used it to defend the Petitioner. Fink confirmed much of Saripkan's testimony, adding he could have used the fact that witness Charles Rice said one of the perpetrators had a noticeable scar on the left side of his face or neck to cross-examine Rice about his identification of Petitioner Sample.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition, but the order addressed only the Petitioner's *Brady* claims and not his claims that his death sentence was unconstitutionally imposed. The Petitioner filed a motion to reconsider the post-conviction court's order. The lower court denied the motion to reconsider, finding that only the *Brady* claims were properly before the court and that the Petitioner's *Apprendi* claims were without merit under Tennessee law. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because: (1) the State improperly suppressed multiple pieces of material evidence; (2) the State knowingly presented false testimony; and (3) his sentence of death was imposed based upon aggravators not presented to a grand jury, contained in the indictment, and proved to a jury beyond a reasonable doubt.

### A. Statute of Limtiations

The Petitioner filed his petition outside the relevant statute of limitations, however, we conclude this Court may review his claim because due process prohibits strict application of the statute of limitations in this post-conviction case. At the time the Petitioner filed this petition for post-conviction relief, the Post Conviction Procedure Act stated:

> A prisoner in custody under sentence of a court of this state must petition for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition shall be barred.

T.C.A. § 40-30-102 (1990). The parties agree that the three-year statute of limitations began to run on July 1, 1986, and that the present petition, filed in January of 1995, was filed well after the limitations period expired. Due process may prohibit strict application of the statute of limitations in a post-conviction case "when the grounds for relief, whether legal or factual, arise after . . . the point at which the limitations period would normally have begun to run." *Sample v. State*, 82 S.W.3d 267, 272 (Tenn. 2002) (citing *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)). In such a case, the court must determine whether application of the limitations period would deny the petitioner a reasonable opportunity to present the claim by balancing the "liberty interest in 'collaterally attacking constitutional violations occurring during the conviction process,' . . . against the State's interest in preventing the litigation of 'stale and fraudulent claims.'" *Id.* (citations omitted). It is upon this basis that we review the Petitioner's claims.

## B. Post-Conviction Claims

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgement of a constitutional right. *See Cauthern v. State*, 145 S.W.3d 571, 597 (Tenn. 2004) (citing T.C.A. § 40-30-103). Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003); *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id.* (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). However, a post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

In the case under submission, the Petitioner's claims stem from allegations that the State wrongfully suppressed evidence. In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id*. (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under Brady:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove these due process violation prerequisites by a preponderance of the evidence. *Id*. (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263 (1999)). Additionally, "[t]he duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of

11

whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (citing *Johnson*, 38 S.W.3d at 56).

The Tennessee Supreme Court defined "material" within the context of Brady:

Evidence is deemed to be material when "*there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different*." [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted) (emphasis added)*; see Cauthern*, 145 S.W.3d at 598-99 (Tenn. Crim. App. 2004) (emphasis added) (citing *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

This Court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (citations omitted); *State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App., at Nashville, Jan. 28, 1999), *perm. app. denied* (Tenn. July 12, 1999). Where there is a delayed disclosure of evidence, this Court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. *Caughron*, 855 S.W.2d at 548. "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is 'too late for the defendant to make use of any benefits of the evidence.'" *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App., at Nashville, June 19, 1998), *no Tenn. R. App. P. 11 application filed*. An incomplete response to a *Brady* request might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citation omitted). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the *Brady* violation may be cured. *Ewing*, 1998 WL 321932, at *9.

On appeal, this issue presents a mixed question of law and fact. *Cauthern*, 145 S.W.3d at 599. The post-conviction court's findings of fact, such as whether the defendant

requested the information or whether the State withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. *Id*. The post conviction court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness. *Id*.

As previously stated, proof that a *Brady* violation has occurred requires four elements, two of which are (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); and (2) that the State suppressed the information. *See Edgin*, 902 S.W.2d at 389. The post-conviction court in this case found: "There is no question that the petitioner has satisfied element #1, as he filed a written motion requesting exculpatory evidence prior to trial, and an order was entered by the trial judge granting that motion." The post-conviction court similarly determined that the Petitioner had satisfied "element #2 . . . as the State did not turn over any of the below-mentioned material complained of prior to trial (although some items were turned over in redacted form at the pre-trial suppression hearing and some after the testimony of the witness as a '*Jencks*' statement, prior to cross-examination of that witness)." The post-conviction court concluded that the State had "'suppressed' this information, albeit unintentionally, because the information was stipulated to have been copied from the State's file and so was in the possession of the State prior to trial."

We begin our review with the post-conviction court's findings of fact that the evidence was requested and that the State failed to disclose the information. We conclude that the evidence does not preponderate against these findings. As such, the Petitioner has satisfied the first two elements of a *Brady* violation. *See Edgin*, 902 S.W.2d at 389. We turn now to determine whether the Petitioner has proven the two remaining elements of a *Brady* violation: that the withheld information was favorable to the accused and, if so, whether the information was material. *Id*. Again, evidence is deemed material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. *Johnson*, 38 S.W.3d at 58.

### 1. Melvin Wallace

The Petitioner contends that the State committed a *Brady* violation when it failed to disclose to him documents it possessed that showed witness Melvin Wallace could not identify Petitioner Sample from a police line up. Melvin Wallace was the surviving victim of the robbery/murders who testified at trial. He testified that he was shot twice, once in the leg and once in the back, by Petitioner Sample. He further testified that, after Petitioner Sample's gun misfired, Petitioner Sample attempted to shoot Wallace in the head but missed.

13

Wallace said the robbers then left him for dead. Wallace also testified that he watched Petitioner McKay shoot and kill victim Benjamin Cooke. Petitioner Sample asserts that the State withheld information about two lineups that Wallace was shown. In the first lineup, Wallace identified Petitioner McKay and a man named Ralph Franklin as the two men who robbed the L&G Sundry Store. In a second lineup, which included Petitioner Sample, Wallace said he could not identify anyone as being involved in the robbery. In court, Wallace identified Sample as the man who had approached him, wrestled him face to face, and shot him. The Petitioner asserts the State possessed statements "by Mr. Wallace shortly after the offense that he could not identify the second suspect and that it was Larry McKay, not Mike Sample, who stood over him and shot him." The two documents to which the Petitioner refers are: (1) a "Supplementary Offense Report, J.D. Welch, August 30, 1981," in which Officer Welch related a summary of his conversation with victim Melvin Wallace; and (2) the complete report of Sergeant J.D. Douglas to F.G. Warner dated November 17, 1981.

### a. Officer Welch's Supplementary Offense Report

In the Supplementary Offense Report, Officer Welch described the two suspects as:

#1. Male Black, 23 to 24 years of age, 5'8" or 5'9", 150 to 155 lbs., short natural afro, stringy, unkept, wearing a gray shirt with a six inch brown stripe across the pocket, possibly armed with a .22 or .32 caliber revolver, blue steel, short barrel.

#2. Male Black, 25 to 26 years of age, 6', slim, 160 lbs, to 165 lbs., described as tall and dark, no clothing description, believed to be armed with a .45 caliber automatic blue steel, rusty and old in appearance.

The report also contained Officer Welch's synopsis of his interview with victim Melvin Wallace. Officer Welch narrated:

Wallace stated at this time that he knew that something was wrong that the man should not be back there. He heard click click and at this point he looked up over the case and observed that the #1 suspect did have a pistol aimed at the clerk. At this point, he broke and ran to the front of the store, the #1 suspect hollered for him to be stopped and that he did not notice a second subject, which was described as #2 . . . at the front of the store. At this time the number two subject did fire one shot, striking him in the right thigh area just above the knee. . . . At this point the #1 subject had started walking his man forward, being the clerk from the rear, and that he over heard the #2 subject

14

state "Kill all these son-of -a bitches." At this time he heard several shots. The #1 subject did come by where he was lying, and at this point the #1 subject said "This son-of-a-bitch ain't dead," he then shot him in the side, and as he was attempting to reload, Wallace state that he thought that he was going to be killed so he had been lying on his side, playing dead . . . he evidently deflected the third shot at him, which was fired by the #1 suspect. . . .

Contrary to Officer Welch's summary of Wallace's statement, which indicated that both robbers shot at Wallace, Wallace indicated in his formal written statement and at trial that Petitioner Sample fired all three shots at him while McKay fired the other shots. In fact, the bullet in his leg was found to be a .32 caliber bullet.

The post-conviction court found that the statement, "although favorable to the petitioner for impeachment purposes, [was] . . . not material." The court reasoned that, given that only two gunmen were in the store, one with a .32 and one with a .45, and that one of the murdered clerks was shot with a .32, the other with a .45, two gunmen were clearly responsible for the shootings. The post-conviction court further found that, although Wallace never adopted Officer Welch's version of his statement, Officer Welch's report could be used for impeachment purposes. The post-conviction court acknowledged that Officer Welch testified at trial and that this report was turned over to the defense as *Jencks* material after Officer Welch's testimony. The post-conviction court further remarked that the "trial record reflects there was a pause in the trial when it was handed over." The post-conviction court concluded that it was "only reasonable to conclude that the defense read it, had it available to cross-examine the officer, and had it prior to Mr. Wallace's testimony for his cross-examination as well."[1] Because defense counsel elected not to cross-examine Officer Welch and elected not to recall Officer Welch as a witness later on in the trial, the post-conviction court concluded that "[t]he supplement containing a summary of Mr. Wallace's hospital interview was clearly not material in the attorneys' opinion, but was nevertheless in their possession if they chose to make use of it."

After reviewing the document and trial testimony, we agree with the post-conviction court. In order to constitute a *Brady* violation, the information suppressed by the State must have been material. As previously stated, the materiality aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, a defendant must show that there is a reasonable probability that the result of the proceedings would have been different. We conclude that this information is not material because there is not a reasonable probability that the outcome of the trial would have been different had the

---

[1]We note in *State v. McKay*, Petitioner McKay's attorney testified that the State provided Officer Welch's report after Officer Welch's direct examination but before his cross-examination.

15

report been provided to the Petitioner prior to trial. Wallace was extensively cross-examined about his ability to identify the man who shot him. Evidence was presented tot he jury that Wallace said he was face-down during the shooting, had only seen one man, and was unable to identify the shooter from a lineup. Considering the weight of evidence against the Petitioner and his co-defendant, Officer Welch's report would not have changed the outcome of this case.

### b. Report to F.G. Warner

The Petitioner contends that the State failed to disclose to him an arrest report addressed to F.G. Warner that included statements indicating that the Petitioner was in a lineup in which Melvin Wallace stated that "he could not identify anyone as being the one responsible because he had really only seen one of the male blacks and that was the one that bent over him and shot at his head with a .45 automatic." Wallace later identified the Petitioner as the man who bent over him and shot him.

A report to F.G. Warner by an unknown author on November 17, 1981, is included in the record. While the report appears to be incomplete, it indicates:

> On Monday, August 31, 1981, at 2:43 p.m. [Wallace] viewed a line up which consisted of 7 male blacks, with one of them being Larry McKay. After viewing this line up, Melvin Wallace identified spot #4, that of Larry McKay as being one of the persons responsible for the hold up and shooting which occurred on 8/29/81. He did sign a line up I.D. card to this effect and he did so state in a written statement taken from him after the line up. It should be noted that then at 2:55 p.m. a line up was held with again 7 male blacks, this time with Michael Samples [sic] and Charles Malone being placed in this line up. After viewing this lineup Melvin Wallace stated he could not identify anyone as being the one responsible because he had really only seen one of the male blacks and that was the one that bent over him and shot at his head with a .45 automatic. This would have been Larry McKay. A written statement was taken from him, a copy of which is hereto attached and self explanatory.

The post-conviction court noted that the comment, "This would have been Larry McKay," was clearly an opinion of the unidentified author, as the witness would not have known the co-defendant's name. The post-conviction court found, "The trial attorneys cross-examined Wallace vigorously from his statement and lineup cards stressing the fact that he identified Larry McKay and Robert Franklin as the perpetrators, and did not identify the [P]etitioner." The post-conviction court found the supplement was neither exculpatory nor adopted by Melvin Wallace as his own statement. The post-conviction court found the

16

supplement "might have been favorable to the [P]etitioner as an impeachment tool, but cannot be considered material exculpatory evidence."

We agree with the post-conviction court that the Petitioner is not entitled to relief pursuant to *Brady* based upon the State's failure to disclose this document. The report clearly contradicts Wallace's trial testimony and is favorable to the Petitioner because the report indicates Wallace was unable to identify the Petitioner in a police lineup. This evidence, however, is not material. The proof at trial revealed that the Petitioner and McKay were apprehended the day following the robbery/murders when police found the .45 automatic on McKay. Police determined that the .45 automatic had been stolen during a robbery of Lillie & Eddie's Grocery, where Petitioner Sample had been identified as one of two robbers. Police also found a .32 caliber revolver inside the vehicle when Petitioner Sample was apprehended. Witnesses said that Petitioner Sample used a .32 caliber revolver with a broken trigger guard during the Lillie & Eddie robbery, and the .32 revolver found in the car with Petitioner Sample had a broken trigger guard. Further, the .32 revolver used to shoot Wallace during the L&G Sundry store robbery misfired. Finally, during Wallace's cross-examination at trial, Petitioner Sample's trial attorney asked Wallace about the lineup wherein he failed to identify Petitioner Sample. The attorney had Wallace identify a photograph from the lineup, had Wallace identify his mark indicating he did not see anyone in the lineup who had been involved in the robbery, and then questioned Wallace extensively about his inability to identify Petitioner Sample minutes after he identified Petitioner McKay and another man in a lineup. Considering the weight of the evidence against the Petitioner and the nature of the evidence the State failed to disclose, we cannot conclude that a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed.

## 2. Charles Rice Testimony

The Petitioner next contends that the State improperly failed to disclose a "Memphis Police Department Supplementary Offense Report" dated August 30, 1981. The report contained Rice's account of the L&G Sundry Store robbery and contained Rice's description of the two men who robbed the L&G Sundry Store, including that one of the suspects had a "noticeable scar on the left side of his face or neck." The Petitioner contends that neither description was consistent with his appearance around the time of the robbery/murders and that the document could have been used by the defense during Rice's cross-examination.

At trial, sixteen-year-old Charles Rice testified that he went to L&G Sundry Store to buy cigarettes. As he arrived at the store, he saw the robbery in progress. He turned and ran home and told his mother what he had seen. He later reported the information to the police, making a positive identification of both Larry McKay and Michael Sample. The August 30,

1981 supplementary offense report upon which the Petitioner relies, describes the perpetrators as:

> #1. Male Black, dark complexion, approximately 5'10", 150 lbs, with noticeable scar on the left side of his face or neck. Wearing white jeans, black silk shirt-buttoned up with the top couple button unbuttoned. Wearing a necklace, possibly silver, with nothing attached to it. This is the male black who he described as having the scar and who he observed shoot Steven Jones and he was holding the pistol in his right hand. Charles believes the pistol to be a black 45.

> #2. Described as light skinned, medium build, 5'5", 5'6", 160 lbs, hair combed straight back and hair not being completely black but possibly having a light brown tint to it. This male black was wearing a blue silk shirt with a flowered design and jeans. This is the male black who was standing behind number 1 male black in the checkout line.

The post-conviction court noted that neither Petitioner Sample nor Petitioner McKay had a noticeable scar on his neck or face. The post-conviction court acknowledged that, although this information "is favorable to the [P]etitioner to some extent, he was identified by several witnesses as the robber carrying the .32, and his co-defendant was the one identified as possessing the .45." The post-conviction court concluded that "this description would hardly be exculpatory as to the [P]etitioner, except in a general way by casting doubts as to Rice's general observations." The post-conviction court further noted that "Rice admitted at trial that he had at first lied to the police, even telling them at one point that he had not been present at all." The court also acknowledged that "Rice's statement was turned over to the defense after Rice's testimony, and he was cross-examined about this statement as well as a statement he gave to the co-defendant's . . . investigator . . . in which he stated that he didn't see anything, and that he had lied to the police about being present." Also, Rice's mother testified that she did not believe her son's story about the killings and advised him not to talk with police officers. The post-conviction court determined that Rice's credibility was impeached at trial by these admitted lies to the police and to Larry McKay's investigator. The court continued that "his description of the robber with the .45 having a noticeable scar, in this court's opinion, if made known to the jury, would not have affected their reliance on his testimony as to his identification of the [P]etitioner to any significant degree." The court concluded that the failure of the State to turn over this supplement to the defense cannot "reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict."

We conclude that while this information is favorable to the Petitioner to some extent

it does not create a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. Rice, at one point, described one of the suspects as having a noticeable scar. He then later positively identified Petitioner Sample and Petitioner McKay as the robbers, neither of whom have a scar. This information could have been used to impeach Rice's identification. Rice, however, had admitted to lying to police and to defense investigators, both of whom he told he had not seen the robbery, and he was vigorously cross-examined about his dishonesty. Considering this, and the weight of the evidence supporting Petitioner Sample's conviction, we conclude that he is not entitled to relief on this issue.

### 3. Grover Jones and Possible Drug Sale Connection

The Petitioner next contends that the State's improper failure to disclose the document titled "Memphis Police Department Supplementary Offense Report," dated August 30, 1981, deprived the Petitioner of additional exculpatory information. The report reflected that Grover Jones, victim Steve Jones's uncle, was the owner of the L&G Sundry Store. The author of the report indicated that Grover Jones's girlfriend was asked "if she knew anything about dope peddling or anything going on in the store and she stated that she did not." The author indicated that he attempted to talk with Grover Jones but "could not get anything out of him, he was crying and beating on the wall, however he did deny having anything to do with dope." The author of the report explained, "The reason the writer was asking about dope was because there [were] two boxes of nickel bags . . . in the store and [he] learned that Grover Jones just sold the bags and not marijuana . . . ." The report reflected that the author later learned that Grover Jones was the manager and not the owner of the L&G Sundry Store. The author also learned that "sometime in the last year or so that they had served a warrant on the L&G Grocery . . . and had found a considerable amount of marijuana in the meat coolers, which is located in the rear of the store." Grover Jones also explained that he owned L&G Sundry Store and "was in partners with a guy named Pete (something) who has a grocery store on Volentine and this subject was the one who was dealing in dope at the time they were partners, that he was positively not dealing in dope himself." The author of the report opined that Grover Jones was withholding information.

The post-conviction court found this information not to be exculpatory. The court determined that the author's "feeling" that Grover Jones was withholding information was "mere speculation" and this information could not have been used by the Petitioner to impeach Grover Jones's credibility. The court also acknowledged that "[e]ven if the perpetrators could be said to have been committing the robbery/murders to get drugs instead of cash, they would still be guilty as charged in the indictment." The court concluded that "[t]his information is clearly not favorable or material to the Petitioner's defense."

19

On appeal, the Petitioner argues that had his trial counsel had this information they could have used this information to investigate the motives of Melvin Wallace and Charles Rice for being present at the L&G Sundry Store, as well as using this information to impeach the credibility of these witnesses. We conclude first that this information is not exculpatory. The Petitioner must prove that this evidence is "favorable" in order to show a *Brady* violation occurred. Again, favorable evidence is evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *See Johnson*, 38 S.W.3d at 56-57. We cannot conclude that the information contained in this document meets any of these criteria. The fact that drugs were found on the premises a year before the robbery/murders and that police found "nickel bags" on the premises after this crime seems of little import, especially in light of the fact that no drugs were found on the premises at the time of the murder. Further, Officer Malone's opinion that Grover Jones may be withholding information does not provide some "significant aid to the defendant's theory of the case." We conclude that this information does not reflect upon or affect the credibility of any of the State's witnesses. Finally, this evidence is not material in that it does not call into question our confidence in the verdict given the evidence presented against the Petitioner.

### 4. Sammy House

The Petitioner contends that the State improperly failed to disclose a document titled "Supplementary Offense Report" dated August 30, 1981, in which Officer Malone reports that Eddie Wright, the owner and victim of the robbery at Lillie & Eddie's Grocery, told him that a friend had identified Sammy House as a person involved in the robbery. The Petitioner contends that this is evidence that another person was involved in these crimes and, as such, the document would have allowed him to develop an alternative theory about the perpetrator's identity.

In the "Supplementary Police Report," Officer Malone related a conversation with Eddie Wright, during which Wright related that the day after the holdup a friend had identified Sammy House as a person involved in the robbery of Lillie & Eddie's Grocery. Eddie Wright also informed the officer that "some older guys were riding bikes back and forth in front of his store before the [Lillie & Eddie] holdup occurred." Officer Malone indicated in the report that "some older male blacks were riding bikes back and forth in front of the L&G Grocery." Officer Malone indicated a witness had stated that Sammy House was known as a holdup man.

The post-conviction court noted that, at trial, Eddie Wright identified both the Petitioner and Larry McKay as the two robbers inside Lillie & Eddie's Grocery Store. It is

unclear why Wright's anonymous friend thought Sammy House was involved in the robbery. The post-conviction court determined that this anonymous tip was not material. The court found that there had been no showing that Sammy House had anything to do with the robbery of Wright's store or that any investigation would have turned up anything of value to help the Petitioner at trial. The court noted that, in the Lillie & Eddie's Grocery Store robbery, the Petitioner was not only identified by Wright, but also by Darrell Perry, Gino White, and Mike Winfry. The Petitioner was identified in the L&G Sundry Store robbery/murders by Melvin Wallace and Charles Rice. The post-conviction court concluded that "the failure of the State to turn over this anonymous tip suggesting Sammy House as a suspect did [not] result in the [P]etitioner's failure to receive a trial resulting in a verdict worthy of confidence."

We agree with the post-conviction court that the anonymous tip was not material. First, the information pertained to an identification from the Lillie & Eddie's Grocery robbery, not the L&G Sundry Store robbery. The Petitioner and McKay were identified at trial by two witnesses as having committed the L&G Sundry Store robberies. The Petitioner and McKay were arrested within twenty-four hours of the murders with the weapons used in the crime.

The post-conviction court held that confidence in the verdict was not undermined by this evidence considering the other evidence presented, including: that Eddie Wright identified the Petitioner as the man who stole his .45 during the Lillie & Eddie's Grocery robbery; that Gino White identified the Petitioner as one of the Lillie & Eddie's robbers; that, within twenty-four hours of the L&G's Sundry Store murders, the Petitioner was arrested in the car identified as the car used in that robbery; that at the time of the Petitioner's arrest, he possessed in his waistband the .45 stolen from the Lillie & Eddie's robbery; that he carried .45 ammunition in his pocket; that the .45 he carried was positively identified as that used in the L&G Sundry Store robbery; that McKay was identified as the man who used the .45 by Wallace and Charles Rice; and that the Petitioner made incriminating statements implicating himself in the L&G robbery/murders to Charles Malone.

Reviewing the evidence from the trial and the post-conviction hearing, we conclude that, while the State should have disclosed this document, its failure to do so does not undermine our confidence in the verdict. First, the information about House as a possible suspect in the Lillie & Eddie's robbery did not affect Wright's positive identification of Petitioner McKay as one of the Lillie & Eddie's robbers. Further, there was extensive proof inculpating the Petitioner in both crimes. Finally, the Petitioner did not present any proof at the post-conviction hearing about House's alleged involvement or any other alleged suspect in the offenses. Under these circumstances, we cannot conclude that he has shown that he is entitled to relief on this issue.

21

### 5. Willie Everett Statement

The Petitioner contends the State improperly failed to disclose a statement provided by Willie Everett on August 30, 1981, in which Everett provided a description of the robbers and vehicles present at the Lillie & Eddie Grocery robbery. In this statement, Everett indicated he was across the street from the Lillie & Eddie's Grocery during the robbery, and he saw "three black dudes in a blue Mercury, 1973 or '74 Mercury and I seen a '65 Impala Chevrolet four door." He said one male stayed in the vehicle while the other two went around in back of the store, entered the store, and robbed the store. He stated that two more cars pulled up, a 65 Chevrolet and a '73 or '74 Buick. Everett stated that the man in the Chevrolet got a shotgun and the man in the Buick got a shotgun and went into the store. As they were attempting to get away, the Chevrolet stalled in the middle of the street and had to be re-started. Everett's statement clearly indicated that five men were involved in the robbery.

The post-conviction court noted that, during trial, defense counsel attempted to introduce evidence of an apparent tentative identification by Willie Everett of Charles Malone. Defense counsel could have called Willie Everett as a defense witness but chose not to do so. The post-conviction court determined that Willie Everett's statement was not exculpatory. Willie Everett told a very different story from the others, involving three cars, shotguns, and a stalled car. The post-conviction court determined that this story "in no way exculpated the petitioner." Rather, the court noted that "[i]t in fact added more alleged robbers to the mix." The post-conviction court determined that this statement was not material.

We conclude that Willie Everett's statement is not exculpatory. Everett's statement does not contradict the multiple witnesses who identified Petitioner Sample as one of the robbers in the Lillie & Eddie's Grocery store robbery; rather it inculpates three other men in the robbery. Even if the State should have disclosed this information, we cannot conclude that the failure to disclose this information undermines our confidence in this verdict. The Petitioner was identified by multiple witnesses as one of the robbers in the Lillie & Eddie's Grocery robbery. He was also identified by two witnesses in the L&G Sundry Store robbery. He was apprehended while riding in the car with Petitioner McKay, who was also identified as a participant in both robberies. Petitioner McKay possessed the .45 firearm stolen during the Lillie & Eddie's Grocery Store robbery and used during the L&G Sundry Store robbery/murders. In the armrest near where Petitioner Sample was seated in the car, police found the .32 weapon used in the L&G Sundry Store robbery/murders. Given the weight of the convicting evidence, we conclude that the Petitioner is not entitled to relief on this issue.

### 6. Annie Lowe and the Lowe's Cash Grocery Robbery

The Petitioner next contends that the State failed to disclose the Arrest Report addressed to F.G. Warner regarding two robberies at the Lowe's Cash and Grocery. He asserts that, while police successfully connected Petitioner McKay to these robberies, police were unsuccessful in their attempt to connect Petitioner Sample to these robberies.

The record contains a twelve-page copy of a supplement written to F.G. Warner related to another grocery store, Lowe's Cash Grocery, which belonged to Annie and Tommy Lowe. Lowe's Cash Grocery was robbed by two men on August 7, 1981, and again on August 29, 1981, around 3 p.m., just eight hours before the L&G Sundry store robbery. In a police line-up, Annie Lowe identified Petitioner McKay (number four in the lineup) as one of the robbers. Mrs. Lowe said the following about Petitioner Sample, who was number six in the lineup, "Number six, I am not to[o] positive about him being the second guy involved, the one who snatched the money from our drawer in the register, but without a doubt number four was the one who held us up twice."

The post-conviction court rejected the Petitioner's contention that Mrs. Lowe's identification of Larry McKay alone was exculpatory: "The fact that the [P]etitioner was not positively identified in a lineup may not be inculpatory, but neither is it necessarily exculpatory." The post-conviction court concluded that this information concerning the two robberies of the Lowe's store is not exculpatory. The court reasoned that, had Mrs. Lowe been called as a witness to testify about her identification of Petitioner McKay, "it may well have turned out to be extremely damaging to the defense, both during the guilt phase and at sentencing if she had identified the Petitioner in court, whether positively or tentatively, as robbing her too, eight hours prior to the killings."

We agree that this information is not exculpatory. Mrs. Lowe identified Petitioner McKay as one of the men who had robbed her store on two occasions, one of which was the same day as the L&G Sundry Store robbery/murders. She tentatively identified Petitioner Sample as the second man involved. The State did not call Lowe to testify. We fail to see how Lowe's identification of Petitioner McKay and tentative identification of Petitioner Sample would have provided some significant aid to the Petitioner's case or challenged the credibility of a key prosecution witness. Further, this information is not material. Multiple witnesses identified Petitioner Sample as the man who had robbed both Lillie & Eddie's Grocery store and the L&G Sundry Store. He was apprehended while riding in the car with Petitioner McKay, who was also identified as a participant in both robberies. Petitioner McKay possessed the .45 firearm stolen during the Lillie & Eddie's Grocery store robbery and used during the L&G Sundry Store robbery/murders. In the armrest by Petitioner Sample, police found the .32 weapon used in the L&G Sundry Store robbery/murders. The

23

Petitioner is not entitled to relief on this issue.

## 7. Presentation of False Testimony

The Petitioner contends that the State compounded the *Brady* violations it committed by soliciting testimony from witnesses in direct contradiction of information contained within the withheld police reports. Specifically, the Petitioner cites Melvin Wallace's testimony that the Petitioner was the individual who came over to him as he lay on the floor and shot him. The suppressed material indicates that Melvin Wallace identified Larry McKay as the person who stood over and shot him. Additionally, the Petitioner cites to Charles Rice's pre-trial description of the man who shot Jones as having a noticeable scar when Rice at trial identified Petitioner Sample, who does not have a scar, as the man who had shot Jones.

As discussed previously, Melvin Wallace and Charles Rice were extensively cross-examined about their identification of Petitioner's Sample and McKay. Rice's credibility was impeached when the defense highlighted for the jury that Rice had lied to police. Wallace was extensively cross-examined about his ability to identify the man who shot him because he said he was face-down during the shooting, had only seen one man, and was unable to identify the shooter from a line-up. The Petitioner presented no evidence at the post-conviction hearing indicating that the State knowingly elicited any false testimony at trial. He is not, therefore, entitled to relief on this issue.

## II. Apprendi/Ring

The Petitioner asserts that his death sentence violates the United States Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), because his indictment does not list the aggravating circumstances upon which the trial court based its imposition of a death sentence. The Petitioner concedes that Tennessee courts addressing this question have found that Tennessee's capital sentencing scheme does not require aggravating factors to be pled in the indictment. He submits, however, that these decisions are in conflict with precedent established by the United States Supreme Court.

Relying upon *Apprendi* and *Ring*, the Petitioner submits that he was denied due process of law because the indictment returned by the grand jury did not include facts that would qualify him for the death penalty. In other words, he maintains that first degree murder is not a capital offense unless accompanied by aggravating factors. In order to elevate the crime to capital murder, he alleges that the indictment must include language of the statutory aggravating circumstance(s).

The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. *State v. Reid*, 164 S.W.3d 286, 312 (2005); *Leach*, 148 S.W.3d at 59; *Berry*, 141 S.W.3d at 562; *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004); *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn. 2002). Our Supreme Court explained, "The focus in *Apprendi*, *Ring*, and *Blakely* was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." *Berry*, 141 S.W.3d at 560. This Court is bound to follow the precedent established by our Supreme Court. The Petitioner is not entitled to relief on this issue.

## III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE